Meredith A Jury, Esq., Of Counsel (SBN 71394)
Summer Shaw, Esq. (SBN 283598)
SHAW & HANOVER, PC
44-901 Village Court, Suite B
Palm Desert, CA  92260
Telephone No:(760) 610-0000
Facsimile No: (760) 687-2800
Email: ss@shaw.law
*Attorneys for Appellants, Marcus Albert Romero and Natalie Victoria Romero*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>MARCUS ALBERT ROMERO and NATALIE VICTORIA ROMERO,<br><br>                 Debtors. | Chapter: 7<br><br>Bankruptcy Case No.: 6:22-bk-12942-WJ<br><br>Appeal No.: 5:23-CV-01010-fla |
| MARCUS ALBERT ROMERO and NATALIE VICTORIA ROMERO<br><br>                Appellants,<br><br>   vs.<br><br>TODD A FREALY, CHAPTER 7 TRUSTEE,<br><br>              Appellee. | **OPENING BRIEF BY APPELLANTS MARCUS ALBERT ROMERO AND NATALIE VICTORIA ROMERO** |



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# __Table of Contents__

**I.  STATEMENT OF THE CASE** ........................................................ 5

   A. Factual and Procedural Background ............................................. 5

   B. What This Case is Really All About .............................................. 7

**II.  JURISDICTIONAL STATEMENT** ............................................. 9

**III.  STATEMENT OF ISSUES** ......................................................... 10

**IV.  STANDARD OF REVIEW** ......................................................... 10

**V.  SUMMARY OF THE ARGUMENT** ........................................... 11

**VI.  ARGUMENT** .............................................................................. 15

   A. *Jevic* Forbids the Use of the Carved-Out Equity to Pay Unsecured Creditors Before Paying the Homestead Exemption ......................... 15

   B. The Analysis in and the Policy Behind *Tillman* Demands Reversal........... 19

   C. The Homestead Exemption Attaches to the Carveout.................................. 24

   D. Refusing to Compel Abandonment Based on A "Compromise Motion" Which Compromises Nothing Was An Abuse of the Court's Discretion ........ 28

   E. A "Compromise Motion" of A Nonexistent Controversy Is Not Proscribed by the Code, Even Under the Bankruptcy Court's 105 Powers ........................ 29

   F. Bankruptcy Code Section 105, Longstanding Policies and Equity Weigh Against a Trustee Selling Fully Encumbered Property and Evicting Debtors 37

**VII. CONCLUSION** .............................................................................. 39



1

2

<u>**Table of Authorities**</u>

3

**Cases**

4

*Cryzewski v Jevic Holding Corp.*, 580 U.S. 451 (2017) ........................... 7, 13, 16, 17

*Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1065 (9th Cir. 2001).................................. 10

*Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F. 2d 1358 (9th Cir. 1992)................................................................................................................ 9

*Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 279 (9th Cir. 1992)........................... 10

*Gebhart v. Gaughan (In re Gebhart)*, 621 F. 3d 1206, 1210 (9th Cir. 2010)........... 19

*In re A & C Properties,* 784 F.2d 1377 (9th Cir. 1986)...................................... 29, 30

*In re Bunn-Rodemann*, 491 B.R. 132 (Bankr. E.D. Cal. 2013) ................................ 24

In re *Christensen*, 561 B.R. 195 (Bankr. D. Utah 2016) ................................. passim

*In re Cumberbatch*, 302 B.R. 675 (Bankr. C.D. Cal. 2003) .................................... 18

In re *Kelley*, 300 B.R. 11 (9th Cir. BAP 2003)........................................................ 18

*In re KVN,* 514 B.R. 1 (9th Cir. BAP 2014) ...................................................... 37, 38

*In re Tovan Construction, Inc.*, 2021 WL 1235359 (Bankr. E.D. VA. 2021).......... 18

*In re Turnage*, 644 B.R. 656 (Bankr. W.D. N.C. 2022) .............................. 26, 27, 37

*In re Wilson*, 494 B.R. 502 (Bankr. C.D. Cal. 2013)......................................... 24, 25

*J.P. Morgan Inv. Mgmt., Inc. v. U.S. Trustee (In re Martech USA, Inc.),* 188 B.R. 847 (9th Cir. BAP 1995) ........................................................................................ 9

*Jubber v. Bird (In re Bird)*, 577 B.R. 365 (10th Cir. BAP 2017) ................. 20, 23, 38

*Klein v. Chappell (In re Chappell),* 373 B.R. 73, 76 (9th Cir. BAP 2007) ............. 10

*Lac du Flambeau Band of Lake Superior Chippewa Indians v Coughlin,* 599 U.S. --- , 143 S. Ct. 1689 (2023) ........................................................................................ 7

*Law v. Siegel,* 571 U.S. 415 (2014)......................................................................... 23

*Owen v. Owen*, 500 U.S. 305 (1991).................................................................... 7, 19

*Preblich v. Battley*, 181 F. 3d 1048 (9th Cir. 1999).................................................. 9

*Roach v. Marshack (In re Roach)* (B.A.P. 9th Cir. 2019) ........................... 34, 35, 36

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



*Slimick v Silva (In re Silva)*, 928 F. 2d 304 (9th Cir. 2007) ........................................ 9

*Stark v Pryor (In re Stark),* 2022 WL 2316176 (E.D. N.Y. 2022) ..................... 25, 26

*Summerlin v. Turnage (In re Turnage)*, 648 B.R. 793 (W.D. N.C. 2023) ............... 26

*Temecula v. LPM Corp. (In re LPM Corp.),* 300 F.3d 1134, 1136 (9th Cir. 2002) . 10

*U.S. v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) ............................................ 11

*United States v. Warfield (In re Tillman)*, 53 F. 4th 1160 (9th Cir. 2022) 8, 13, 19, 20

**Statutes**

11 U.S.C. § 105 ................................................................................................ passim

11 U.S.C. § 363 ............................................................................................................ 24

11 U.S.C. § 507 ........................................................................... 7, 12, 16, 36

11 U.S.C. § 551 ............................................................................................... 18

11 U.S.C. § 554 ................................................................................................... 6

11 U.S.C. § 724 ............................................................................................... passim

11 U.S.C. § 726 ......................................................................................... 7, 12

11 U.S.C. §554(b) ........................................................................................... 27

11 U.S.C. Section 522 .................................................................. 28, 30, 31, 32

28 U.S.C. § 157 ............................................................................................. 8

28 U.S.C. § 158 ............................................................................................. 8

Cal Code Civ. Proc. § 703.140 .................................................................. 24

Cal. Code Civ. Proc. § 704.710 ................................................................. 17

Cal. Code Civ. Proc. § 704.730 ........................................................... 4, 17

**Rules**

Fed. Rules of Bankr. Pro. Rule 8002 ......................................................... 8

Fed. Rules of Bankr. Pro. Rule 9019 ............................................... passim



# I.     STATEMENT OF THE CASE

### A.   Factual and Procedural Background

Debtors Marcus and Natalie Romero (the "Debtors"/"Appellants") filed a chapter 7 bankruptcy petition on August 4, 2022.[1]  Among the assets on their "Schedule A/B" (real and personal property) was their residence at 45119 Riverstone Court, Temecula, California (the "Residence") with a value of $1,254,300.00.[2]  Their family of five lived in the Residence.  They claimed a homestead exemption on the Residence in "Schedule C" (exemptions) under Cal. Code Civ. Proc. § 704.730 in the amount of $53,464.40[3] but they amended Schedule C on February 17, 2023 to increase the claimed exemption to $558,000.00 (Debtors' homestead exemption).[4]  The Debtors' "Schedule D" (secured creditors) showed first trust deed holder Chase Bank was owed $521,585.60; second trust deed holder Cenlar Mortgage was owed $258,223.00; third trust deed holder Financial Casualty and Surety was owed $250,000.00 ("3rd deed of trust"); and Riverside County Tax Collector was owed $6,625.25.[5]  In addition, the United States of America filed two tax liens against the Residence on April 5, 2022, with an approximate balance due of $171,000 ("Tax Liens").[6] These liens totaled approximately $1,207,433, which, based on the Debtors' valuation of the Residence, left no realizable equity in the property even without taking into consideration the Debtors' homestead exemption.[7] The Debtors expected the fully encumbered Residence to pass through the chapter 7 proceeding and that they would deal with the secured debt outside of bankruptcy to keep their home for their family.[8]

---

[1] Excerpts of Record ("EOR") 00013-00087. The EOR is consecutively paginated for ease of reference.
[2] EOR 00022.
[3] EOR 00031.
[4] EOR 00297.
[5] EOR 00033-00037.
[6] EOR 00035 & 00093.
[7] EOR 00593 [Transcript of the March hearing at page 20, lines 1-2.
[8] EOR 00221.



The chapter 7 trustee, Todd Frealy (the "Trustee") had other ideas.  On February 10, 2023, he filed Trustee's Motion to Approve Compromise under Rule 9019 (the "Compromise Motion"), and simultaneously filed Trustee's Objection to Debtors' Claim of Exemptions (the "Homestead Exemption Motion") (Compromise Motion and Homestead Exemption Motion collectively the "Motions").[9] Underlying these Motions was a deal that the Trustee had brokered with the 3rd deed of trust holder, Financial Casualty & Surety ("FCS") whereby FCS would consent to a sale of the Residence on the condition that it receive 60% of the net proceeds due on the FCS trust deed from such sale after the first and second trust deed holders were paid, and after the costs of sale and the real property taxes were paid, with the remaining 40% due under the trust deed deemed a carveout for the benefit of the bankruptcy estate.  Under the Trustee's calculations, if the property sold for $1,125,000, the sale would result in FCS receiving about $150,000 and the estate receiving about $100,000.[10]

The Compromise Motion (which compromised absolutely nothing, as discussed in Argument below) also asserted that the Trustee could ignore the Debtors' homestead exemption because it could not attach to the carveout.   The homestead exemption Motion expanded that argument, objecting to any homestead exemption asserted by the Debtors and in particular arguing that the exemption could not attach to the carveout, citing no precedential authority for that assertion.

The Debtors responded by filing a Motion to Compel Trustee to Abandon Property of the Estate (the "Abandonment Motion") on February 14, 2023.[11]  They argued that the fully encumbered Residence was burdensome to the estate based on the ongoing mortgage and tax payments and was of inconsequential value and benefit to the estate under section 554.

---

[9] EOR 00088-00155.
[10] EOR 00166.
[11] EOR 00218-00294.



A flurry of briefing followed the filing of these motions, with the Debtors opposing the Trustee's Motions, the Trustee opposing the Debtors' Motion to Compel Abandonment, and replies filed all around.[12]   The bankruptcy court heard the motions on March 7, 2023, at which time it made an oral tentative ruling which would approve the Compromise Motion, deny the Abandonment Motion, and allow the homestead exemption but not allow it to attach to the carveout.[13]   However, both parties had requested a continuance of the hearing, which the Court granted to May 2, 2023, so his oral tentative was not finalized on March 7.  Before the continued hearing, the Trustee filed supplemental points and authorities whereby he indicated that the agreement with FCS had been changed from a carveout to an assignment of a partial interest in FCS's deed of trust, attempting to make the agreement palatable under an unpublished Ninth Circuit Bankruptcy Appellate Panel (BAP) ruling[14] that had blessed such an assignment as proper (but under completely different facts as discussed below).[15] After further argument, on May 2, 2023, the bankruptcy court stuck with its tentative by approving the Compromise Motion, denying the Abandonment Motion, and ruling that homestead exemption was allowed but could not attach to the carveout, entering the Order on the same date.[16]

**B.   What This Case is Really All About**

Debtors filed a chapter 7 while residing in a Residence that they owned which was fully encumbered.  Because the Residence had no realizable equity for the estate, particularly when their homestead exemption was taken into account, they had a reasonable expectation that the fresh start which a bankruptcy discharge would give them (*Lac du Flambeau Band of Lake Superior Chippewa Indians v Coughlin,* 599 U.S. ---, 143 S. Ct. 1689, 1697 (2023)) meant they could keep their

---

[12] EOR 00299-00571.
[13]  EOR 00572-00604.
[14] *Roach v. Marshack (In re Roach)*, 2019 WL 408628 (9th Cir. BAP 2019).
[15] EOR 00494-00566.
[16] EOR 00605-00621.



Shaw & Hanover
Bankruptcy, Creditor Rights & Related Litigation

home and deal with the secured debt outside bankruptcy, since secured debt passes through. *Owen v. Owen*, 500 U.S. 305, 308-309 (1991).   Instead, an aggressive Trustee decided to take extraordinary steps to sell the home out from under the Debtors by making a deal with a junior secured creditor that had not attempted to foreclose on the Residence from its junior position, despite nonpayment.  His scheme was intended to allow the estate to skirt the statutorily mandated distribution order set forth in the Bankruptcy Code sections 726(a) and 507, using part of secured debt to pay unsecured creditors who were lower in priority than the Debtors' homestead exemption.

The Supreme Court has forbidden such attempts to pay claims in an order which differs from that set forth in section 726  in *Cryzewski v Jevic Holding Corp.*, 580 U.S. 451 (2017).  The Trustee here may not pay the unsecured creditors and his expenses ahead of the Debtor's homestead exemption.  In addition, the Ninth Circuit ruled in *United States v. Warfield (In re Tillman)*, 53 F. 4th 1160, 1168-69 (9th Cir. 2022), that a claim of exemption *withdraws* the property from the bankruptcy estate. In *Tillman*, the circuit held that a trustee could not recover the penalty portion of a tax lien and use it for the benefit of the estate's unsecured creditors because the debtors' homestead exemption withdrew the property which was subject to the lien from the estate, such that the debtor had to deal with the lien outside of bankruptcy. As discussed more thoroughly in Argument below, the same reasoning prevents the Trustee here from snatching value for the unsecured creditors from the debtors' homestead exemption.  The exemption should attach to any carved-out value.

This scheming cannot be tolerated by equity and sound policy.  Debtors with fully encumbered property should be allowed to expect that they will keep their homes or at a minimum realize the value of their homestead exemptions before unsecured creditors get paid.  The Summary of Argument and Argument sections below will demonstrate why reversal of this Order is compelled by Supreme Court and Ninth Circuit authority, bankruptcy court case law, sound policy and common



1  decency.

2  ## II.   JURISDICTIONAL STATEMENT

3      The bankruptcy court order appealed covered three separate motions: Trustee's

4  Motion to Approve Compromise Under Rule 9019, Trustee's Objection to Debtors'

5  Claim of Exemptions, and Debtors' Motion to Compel Trustee to Abandon Property

6  of the Estate.  All three motions fall within the bankruptcy court's core jurisdiction

7  as set forth in 28 U.S.C. § 157 (b)(2), specifically subsection (A), matters

8  concerning the administration of the estate as to the Compromise Motion and the

9  Abandonment Motion, subsection (B), allowance or disallowance of exemptions as

10  to the Objection to Exemptions; and subsection (O) other proceedings affecting the

11  liquidation of the assets of the estate, as to all three motions because the ultimate

12  goal of the Trustee is to sell the debtors' house.  Therefore, the bankruptcy court had

13  jurisdiction under 28 U.S.C. § 157(b)(2).  The district court has jurisdiction of this

14  appeal under 28 U.S.C. § 158(a)(1).

15      The Order on appeal was entered by the bankruptcy court on May 2, 2023.  The

16  Notice of Appeal was filed on May 15, 2023, within 14 days of entry of the Order,

17  so the appeal was timely.  Rule 8002(a)(1).[17]  The Order totally disposed of all the

18  issues raised in the three motions by approving the compromise, allowing in part

19  and disallowing in part the debtors' homestead exemption, and by denying the

20  abandonment, without any conditions on the three dispositions.  Therefore, the

21  Order is final and appealable because it "end[s] any interim disputes from which

22  appeal would lie."  *Slimick v Silva (In re Silva)*, 928 F. 2d 304, 307 n. 1 (9th Cir.

23  2007) (internal quotation marks and citations omitted).  Also, an order can be

24  appealed under the "flexible finality" doctrine if it "(1) resolves and seriously

25  affects substantive rights and (2) finally determines the discrete issue to which it is

26

27  _____

28  [17] Unless specified otherwise, all chapter and section references are to the
Bankruptcy Code/the "Code," 11 U.S.C. §§ 101-1532, and all Rule references are to
the Federal Rules of Bankruptcy Procedure.



addressed." *Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F. 2d 1358, 1363 (9th Cir. 1992). An order denying an exemption constitutes a final, appealable order. *Preblich v. Battley*, 181 F. 3d 1048, 1056 (9th Cir. 1999). A bankruptcy court order approving a compromise is a final, appealable order. *J.P. Morgan Inv. Mgmt., Inc. v. U.S. Trustee (In re Martech USA, Inc.),* 188 B.R. 847, 849 (9th Cir. BAP 1995). The Order finally determined the discrete issues raised in the motions and is final.

## III. STATEMENT OF ISSUES

1. Whether the bankruptcy court erred in entering an order on the Chapter 7 trustee's objection to the Debtors' homestead exemption when the motion stated no actual objection to the exemption claimed and the ruling was nothing more than an advisory opinion from the bankruptcy court about how funds should be dispersed upon a future sale of the Debtors' residence which was in violation of the Code, *Tillman*, and *Jevic* by ruling that the Trustee did not have to pay the Debtors' homestead exemption from the sale proceeds.

2. Whether the bankruptcy court abused its discretion in approving a compromise/settlement where there was no compromise/settlement of a dispute between the lender and the Chapter 7 trustee.

3. Whether the bankruptcy court erred in denying the Debtors' motion to compel abandonment of their residence where the Debtors' homestead exemption was allowed in full triggering *Tillman*, the residence was overencumbered, and the Chapter 7 trustee had no lawful ability to sell the residence, pay the Debtors' their homestead exemption, and make a meaningful distribution to unsecured creditors.

## IV. STANDARD OF REVIEW

The bankruptcy court's factual findings are reviewed for clear error, and its conclusions of law are reviewed de novo. *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 279 (9th Cir. 1992).

The bankruptcy court's interpretation of the Bankruptcy Code and Rules are



-10-

reviewed de novo. *Temecula v. LPM Corp. (In re LPM Corp.),* 300 F.3d 1134, 1136 (9th Cir. 2002). "The determination of a homestead exemption based on undisputed facts is a legal conclusion interpreting statutory construction which is reviewed de novo." *Klein v. Chappell (In re Chappell),* 373 B.R. 73, 76 (9th Cir. BAP 2007), aff'd sub nom. *In re Gebhart*, 621 F.3d 1206 (9th Cir. 2010).

The bankruptcy court's order approving a compromise is reviewed for an abuse of discretion. *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.),* 255 F.3d 1061, 1065 (9th Cir. 2001). The "abuse of discretion" test requires this Court first to consider whether the bankruptcy court identified the correct legal standard for decision of the issue before it, and then to determine whether the bankruptcy court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record. *U.S. v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009)

However, because the bankruptcy court suggested that "if a higher court found that the bankruptcy court could not approve the compromise" because it found there was no controversy, the bankruptcy court could get around such a ruling by approving the agreement pursuant to section 105. Therefore, the order approving the compromise motion should be reviewed de novo because it involves the bankruptcy court's legal conclusions interpreting statutory construction of section 105 and legal conclusions that it can authorize a different priority scheme of payment to creditors under section 507 under its section 105 powers as well.

## V.   SUMMARY OF THE ARGUMENT

When property of a bankruptcy estate is "burdensome" or "of inconsequential value and benefit to the estate" it must be abandoned from the estate. Such burdensome property is most often overencumbered property such as a debtor's residence which has voluntary liens that exceed the value of the residence as is the case here. Fortunately, for debtors who are already down on their luck and are



-11-

prepared to surrender in a chapter 7 whatever *non-exempt* assets they have in exchange for a fresh start, there is no statute or law that allows bankruptcy trustees to circumvent the exemptions created to leave a family with the essentials to start over, or further, to circumvent the priorities for payments from the estate to creditors. And yet, here, the Trustee has tried to create a façade of legitimacy, through his Stipulation with FCS, his Compromise Motion, and his Homestead Objection Motion which, together, unlawfully do circumvent these vital rights under the Code.

California's homestead exemption laws preclude execution sales of property that include a homestead if the sale proceeds are insufficient to pay that amount of value in full. A selling judgment creditor (of which the Trustee stands in the shoes) must pay the homestead exemption in cash, to the Debtors, upon a sale. Therefore, because the Trustee cannot pay the Debtors' homestead exemption in full, the Residence is exempt from the Trustee's forced sale and requires the bankruptcy court to order abandonment of the Residence from the bankruptcy estate.

Further, when one looks closely at the Compromise Motion, there is nothing actually being compromised between the Trustee and FCS; each *A & C* factor is discussed by the Trustee but there is no controversy asserted anywhere in his pleading to be compromised. There is also no statute or Federal Bankruptcy Rule asserted to support the "compromise" for which the Trustee sought to approve. Rather, the Stipulation and Compromise Motion seek the bankruptcy court's approval to enter into a scheme to transfer/sell a portion of a deed of trust secured against the Debtors' Residence, from FCS to the Trustee, and render the Debtors and their three (3) minor children homeless, by proposing that such scheme will allow a sale of the Debtors' Residence without payment of their homestead exemption.

Although the Trustee has not yet obtained an order authorizing sale of the

//



Residence,[18] his intention is clear:  he will market and sell the Residence, pay the first and second consensual liens, pay 60% of the value of the FCS lien to FCS (as determined by the portion of the lien which is secured by the purchase price), keep the cash value of the other 40% to pay administrative expenses and unsecured creditors pro rata,[19] and pay nothing to the Debtors as a result of the homestead exemption.  Debtors assert that by using what would otherwise be the value of their homestead exemption to pay unsecured creditors, the Trustee is violating the order of distributions from a bankruptcy estate as prohibited by the Supreme Court's decision in *Jevic*.  In *Jevic*, the debtors entered into a proposed structured dismissal[20] which carved out a portion of a lienholder's secured value to pay unsecured creditors who were lower in priority under the distribution scheme set forth in sections 726(a) and 507 than an intervening class of priority creditors.  The Supreme Court reversed the bankruptcy court's approval of this structured dismissal, holding that a bankruptcy court may not approve a dismissal that provides for distributions that do not follow the Code's ordinary priority rules.   The same reasoning applies here, the only difference being that the intervening claim with a higher priority than the unsecured creditors is the Debtors' homestead exemption, an exemption provided by state law to shield equity in property from unsecured claims.  The Trustee's carveout creates that freed up equity, because FCS has given up a portion of its secured value to the unsecured creditors.  This runs afoul of *Jevic*.

The Trustee's proposed distribution of the carveout also violates the principles laid down in *Tillman*. There, the Ninth Circuit described what happens when a debtor claims an exemption in a homestead: the property is withdrawn from

---

[18] The Trustee has employed a real estate broker to accomplish such sale.  If the court approves the sale, the Debtors will appeal that Order as well.

[19] EOR 00494-00566

[20] A structure dismissal pertains to the dismissal of a chapter 11 case while approving certain distributions to creditors, among other conditions on the dismissal.  *Jevic*, 580 U.S. at 457.

1  the estate.   Any value of that property which a trustee attempts to recover under

2  section 724(a) may not be used to benefit the estate because of this withdrawal.

3  *Tillman*, 53 F. 4th at 1173-74.  In the same fashion, the Trustee here is "recovering"

4  or carving out a portion of a junior lien from property that is no longer property of

5  the estate.  He cannot use this non-estate property to pay estate creditors.

6      There is no precedential authority on whether a homestead exemption applies

7  to a portion of a lien carved out for the benefit of the estate.  Some bankruptcy court

8  cases and district court cases have ruled that it does, because the *property* which

9  gives it cash value has been exempted.  Other cases have said it does not, asserting

10  that the value was created by the trustee's efforts or originally belonged to the

11  secured creditor which is entitled to do with it whatever it wants (despite *Jevic).*

12  Debtors submit that the cases which say the exemption does apply to the carveout

13  are better reasoned and should be persuasive to this court.

14      Finally, section 105 of the Code gives the bankruptcy courts the power to

15  make orders which are necessary to implement the provisions of the Code. Debtors

16  assert that included in those provisions are the policy behind the fresh start which a

17  chapter 7 discharge is meant to assure to the honest but unfortunate debtors. No one

18  here argues that the Debtors are not honest and unfortunate.  Included in that policy

19  is the concept that chapter 7 trustees should not ordinarily seek to liquidate

20  overencumbered property such as the Residence, particularly when it would

21  unhouse a family of five.  Secured debt passes through bankruptcy and debtors

22  should be given the opportunity to deal with it outside the case, as was the intent of

23  these Debtors.  An aggressive trustee and a third priority lienholder with no intent to

24  foreclose have schemed to take these Debtors' dream away.  Public policy cannot

25  countenance such acts.

26  //

27  //

28  //



-14-

1

## VI.   ARGUMENT

2

### A. *Jevic* Forbids the Use of the Carved-Out Equity to Pay Unsecured

3

### Creditors Before Paying the Homestead Exemption

4

The bankruptcy court made a telling statement while ruling for the Trustee in

5

its oral tentative announced on March 7, 2023:

6

"A lender can do whatever they want.  A secured lender can do whatever it

7

wants with its cash collateral.  It can do whatever it wants with the proceeds of its

8

loan. It can do whatever it wants with its lien."

9

Transcript of Proceedings, March 7, 2023, p. 23, lines 7-10.[21]

10

Many might have thought that to be the case before *Jevic*.  In fact, that is what

11

the debtors and certain secured creditors thought could happen in the proposed

12

structured dismissal in that case.  When Jevic Holdings ("Jevic") filed its chapter 11

13

petition, it owed senior secured debt to its parent company Sun Capital Partners

14

("Sun") and CIT Group.  Before filing bankruptcy, Jevic had ceased operations and

15

laid off truckdrivers without following the requirements of the federal Worker

16

Adjustment and Retraining Notification Act (WARN Act) which requires a 60-day

17

notice before termination.  The truckdrivers sued Jevic and Sun and obtained

18

summary judgment against Jevic, which was accorded priority status as a claim in

19

the chapter 11 because it was based on wage claims of the truckdrivers. The

20

litigation continued against Sun.

21

In addition, the Unsecured Creditors Committee (the "Committee") sued Sun

22

and CIT, on behalf of the estate, over the leveraged buyout which led to Jevic's

23

financial distress, asserting fraudulent transfer claims.   Subsequently, Sun, CIT,

24

Jevic and the Committee negotiated a settlement which would resolve the

25

Committee's lawsuit and allow dismissal of the chapter 11 by: (1) CIT depositing

26

$2 million into an account to pay the Committee's legal fees and administrative

27

expenses; and (2) Sun assigning its lien on Jevic's assets, worth about $1.7 million,

28

---

[21] EOR 00596 at lines 7-10.



to a trust to pay taxes and other administrative expenses and then distribute the remainder pro-rata to the general unsecured creditors.  The settlement specifically did not provide for payments to the priority wage creditors because Sun, the source of the funds, was still litigating at that time with the truckdrivers and didn't want to finance that litigation.  The bankruptcy court approved this settlement, including the distribution scheme, over objections from the truckdrivers and the United States Trustee about the order of distribution, but the Supreme Court struck it down because it failed to follow the distribution order set forth in section 726(a).

The Supreme Court noted that the Code's priority system is usually implemented when the assets of a debtor's estate are distributed at the termination of a case, whether in a chapter 7 or a liquidating chapter 11.  It is "fundamental to the Bankruptcy Code's operation… 'designed to enforce a distribution of the debtor's assets in an orderly manner…in accordance with established principles rather than on the basis of the inside influence or economic leverage of a particular creditor.'" *Jevic*, 580 U.S. at 465 (quoting from H.R. Rep. No. 103-835, p. 33 (1994).)

Section 726(a)[22] provides for the distribution of estate assets, after secured creditors have been paid from their collateral, according to the priority order set

---

[22] Section 726(a) provides:
    **(a)** Except as provided in section 510 of this title, property of the estate shall be distributed—
        **(1)**    first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of—
            **(A)** the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or
            **(B)** the date on which the trustee commences final distribution under this section;
        **(2)** second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is—
            **(A)** timely filed under section 501(a) of this title;



forth in section 507. The order of priority set forth in section 507 (a) is, in general terms as applicable, first to administrative expenses and domestic support obligations, then to other priority claims such as wage claims and taxes, then to general unsecured creditors, and finally to equity holders.  The Supreme Court noted that the proposed distribution of the funds assigned from the secured claim of Sun was to pay the unsecured creditors rather than the higher priority claim of the truckdrivers.  This was a violation of the distribution scheme set forth in Code and could not be countenanced over the objection of any higher priority claimant, such as the truckdrivers.  Beyond just the words of the statutes, the Supreme Court bolstered its ruling by acknowledging the polices behind strictly adhering to the codified priority order:  avoiding the "risks of collusion, i.e., senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors." *Jevic*, 580 U.S. at 470.  It refused to alter the balance set forth in the Code and ruled that Sun could not give the monetary value of its secured

---

**(B)** timely filed under section 501(b) or 501(c) of this title; or
**(C)** tardily filed under section 501(a) of this title, if—
> **(i)** the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and
> **(ii)** proof of such claim is filed in time to permit payment of such claim;

**(3)** third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection;

**(4)**     fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

**(5)**     fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

**(6)**     sixth, to the debtor.



claim to the estate for payment to unsecured creditors when a higher priority creditor objected.

Just like Sun in *Jevic*, FCS proposes to carve out or assign (there is no practical difference here based on the ruling in *Jevic* which considered an assignment) a portion of the monetary value of its junior secured lien for the estate to use to pay unsecured creditors, lower in priority than the tax liens on the property held by the IRS. But the IRS did not object. So, you might ask, where is the higher priority objecting creditor or, in this instance, claim? It is the allowed homestead exemption of the Debtors.

The California automatic homestead exemption applicable in this case is set forth in Cal. Code Civ. Proc. §§ 704.710, et seq. and was enacted long ago to protect equity in a judgment debtor's homestead property from judgment creditors who did not hold a voluntary lien on the debtor's property. § 704.720; In *re Kelley*, 300 B.R. 11 (9th Cir. BAP 2003). Such exemption is automatic, in the sense that it arises by operation of law with no overt act required of the homeowner. *In re Cumberbatch*, 302 B.R. 675 (Bankr. C.D. Cal. 2003). It protects debtor's homestead from a forced sale. A bankruptcy proceeding has been interpreted to be identical to a forced sale; if the trustee tries to liquidate the debtor's home, he is standing in the shoes of a judgment creditor conducting an involuntary sale. *Kelley*, 300 B.R. at 20.

In every sense, the Debtors' allowed homestead exemption in this case stands between equity in the property remaining after all secured claims have been paid and money going to pay the unsecured creditors or administrative expenses of the estate. It is higher in priority than administrative expenses and unsecured claims of the estate. The Trustee here would not have dreamed of selling the Debtors' home and taking the net proceeds from the sale while ignoring the homestead exemption. He knows he cannot touch that protected equity. But he believed what the bankruptcy court said in its ruling: "A secured creditor can do whatever it wants with its cash collateral." *Jevic* says no. The bankruptcy court was wrong. The



-18-

Trustee was wrong.  The Compromise approved by the bankruptcy court and the distribution scheme it contemplates after sale contravenes established precedent. Reversal is necessary.[23]

### B. The Analysis in and the Policy Behind *Tillman* Demands Reversal

The issue before the Ninth Circuit in *Tillman* was admittedly different than the one before this Court.  However, the language and policies stated in the opinion, as well as the arguments by the trustee which the Circuit struck down, reflect a precedent which this Court cannot ignore.  The trustee in *Tillman* sought to use the provisions of section 724(a)[24] to avoid the penalty portion of an IRS lien on the debtor's home and preserve the monetary value of that lien under section 551[25] for the benefit of the estate, i.e., administrative expenses and unsecured creditors. *Tillman*, 53 F. 4th at 1165.  The IRS objected, arguing that section 724(a) avoidance and section 551 preservation did not apply to exempt property.  The debtor had exempted her home using the applicable Arizona homestead exemption.  The Circuit agreed with the IRS, reversing the bankruptcy court's approval of the motion.

After discussing the nature of the homestead exemption, it said repeatedly "'an exemption is an interest *withdrawn* from the estate (and hence from the creditors) for the benefit of the debtor.' *Owen,* 500 U.S. 308. [*Owen v. Owen*, 500 U.S. 305 (1991)]." *Tillman*, 53 F. 4th at 1168 (emphasis in the original).  It also

---

[23] In *In re Tovan Construction, Inc.*, 2021 WL 1235359 (Bankr. E.D. VA. 2021), the bankruptcy court used the reasoning of *Jevic* when denying approval of a compromise which intended to use payments to the estate by the debtor's principal and a related entity to pay a particular creditor, violating the distribution priority order.

[24] Section 724(a) provides: "The trustee may avoid a lien that secures a claim of a kind specified in section 726(a)(4) of this title."

[25] Section 551 provides: "Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate."



cited to its own authority on that issue, *Gebhart v. Gaughan (In re Gebhart)*, 621 F. 3d 1206, 1210 (9th Cir. 2010) for the statement "[a]fter the commencement of bankruptcy proceedings, property interests which are exempted by a debtor are 'withdrawn from the estate'," noting that after exemption the property revests in the debtor. *Tillman,* 53 F. 4th at 1168.  It rejected the reasoning of the bankruptcy court that "it was only the Debtor's equity beyond the mortgage and tax lien that the debtor was entitled to exempt." *Id.,* at 1165.  It also overruled the district court affirmance, where that court stated "that the Debtor was only entitled to use Arizona's homestead exemption to exempt unencumbered property – i.e., the exemption excluded the mortgage and the IRS lien."  The Circuit disagreed. *Id.,* at 1166.

Debtors here have an allowed homestead exemption.  As a result, the Residence has been withdrawn from the estate, subject to the three trust deeds and the IRS tax liens, which the Debtors must deal with outside of the bankruptcy proceedings.  The Trustee cannot make a deal with one of those secured creditors to recapture the withdrawn property and sell it to benefit creditors who are junior to the homestead exemption.  It does not matter, per *Tillman*, that the Debtors had no realizable equity in the Residence when they filed.  It revested in them, nevertheless, leaving them with the obstacles they knew they faced when they filed bankruptcy: the obligation to deal with that secured debt on their own.  *Tillman* reaffirms that expectation.

The legal conclusions and policies espoused in *Tillman* resound in a bankruptcy case and its appeal to the Tenth Circuit BAP, In *re Christensen*, 561 B.R. 195 (Bankr. D. Utah 2016) and *Jubber v. Bird (In re Bird)*, 577 B.R. 365 (10th Cir. BAP 2017).  In *Christensen*[26], the debtors' residences were encumbered by

---

[26] The *Christensen* case actually involved two different debtors, Christensen and Bird, with identical factual scenarios and identical actions by the same trustee, so the bankruptcy court resolved both with one published opinion.



1    liens which exceeded their value on the petition date and both debtors properly

2    exempted their homesteads.  Among the encumbrances was an IRS lien which was

3    junior to voluntary mortgages.   The trustee in *Christensen* sought to use the

4    provisions of 724(b)[27] to subordinate the IRS liens to the estate's interest so that he

5    could sell the property and claim the value of those liens for the estate to pay,

6    among other things, his administrative expenses with a small distribution to

7    unsecured creditors.  The proposed distribution from the sale did not pay anything to

8    the debtors based on their homestead exemptions, which were allowed by the

9

10

[27] Section 724(b) provides:

     (b)  Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title (other than to the extent that there is a properly perfected unavoidable tax lien arising in connection with an ad valorem tax on real or personal property of the estate) and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed--

     (1)  first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

     (2)  second, to any holder of a claim of a kind specified in section 507(a)(1)(C) or 507(a)(2) (except that such expenses under each such section, other than claims for wages, salaries, or commissions that arise after the date of the filing of the petition, shall be limited to expenses incurred under this chapter and shall not include expenses incurred under chapter 11 of this title), 507(a)(1)(A), 507(a)(1)(B), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;

     (3)  third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;

     (4)  fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to such tax lien;

     (5)  fifth, to the holder of such tax lien, to the extent that such holder's allowed claim secured by such tax lien is not paid under paragraph (3) of this subsection; and

     (6)  sixth, to the estate.



1   bankruptcy court. Section 724(b) operates similarly to section 724(a) but allows the

2   trustee to subordinate the entire amount of the tax lien to pay senior encumbrances

3   and administrative priority expenses of the estate.  The debtors opposed the trustee's

4   plans.   However, to assure they could keep their homes, they converted their cases

5   to chapter 13, which made the sale efforts moot and ended the costly litigation.  In

6   the chapter 13 cases, the trustee and his counsel filed fee applications as a basis for

7   priority claims they asserted must be paid in those proceedings.  The ruling on these

8   fee applications resulted in the published opinion, with the bankruptcy court

9   denying the fees as not being based on services which were required for

10   administration of the estates.  *Christensen,* 561 B.R. at 198.

11       The bankruptcy court first cited to the generally accepted principle that

12   trustees should not seek to sell fully encumbered property (discussed more fully in

13   Part F of Argument):  "'it is universally recognized…that the sale of a fully

14   encumbered asset is generally prohibited' (citation omitted)."   The court then

15   characterized the subordination of the IRS liens as a carveout, because it proposed

16   to take a portion of the cash value of a subordinate lien for the benefit of the estate.

17   It concluded the proceeds from the sale were subject to the exemptions claimed by

18   the debtors, analogizing the situation to one where "the secured creditor caps its

19   claim in an amount that is less than the value of the debtor's interest in the property,

20   [so] the remaining value of the debtor's interest in that property is subject to other

21   claims or interests," including exemptions. *Christensen,* 561 B.R. at 209.

22       The court criticized any scheme where carveouts were used by secured

23   creditors or trustees to direct payments to other creditors, administrative or

24   otherwise. It held that a trustee cannot simply by agreement or use of section 724(b)

25   defeat junior liens or the homestead exemption. *Id.* at 210-211. It then analyzed

26   sections 724 and 506( (c)[28] of the Bankruptcy Code and concluded neither provided

27

28   ---

[28] Section 506(c) provides: "The trustee may recover from property securing an
allowed secured claim the reasonable, necessary costs and expenses of preserving,



a basis for a carveout. *Id.* at 213-215. It similarly concluded that the trustee could not sell the properties free and clear of the homesteads because they were not in dispute. *Id.* at 208-209.

The *Christensen* court finished with a robust criticism of the trustee's endeavors to sell the debtors' homes without recognizing the homestead exemptions: "Exemptions are a bulwark against destitution, but one that is not immune from being undermined, circumvented, or torn down. A trustee should not eviscerate a debtor's fresh start by seeking to disallow validly claimed exemptions." *Id.* at 216. Using this sound reasoning, the bankruptcy court denied the fees.

The court here may use similar reasoning to deny the Compromise and the distribution scheme it contemplates from a proposed sale which ignores the homestead exemption on property withdrawn from the estate.

In *Bird* the Tenth Circuit BAP affirmed *Christensen* in all respects, reciting the principles which generally forbid a trustee from selling fully encumbered property and concluding the trustee should have abandoned the residences. *Bird*, 577 B.R. at 374-379. It reinforced the bankruptcy court's focus on the importance of preserving homestead exemptions and eschewed any trustee manipulation of the Code which would bypass that exemption to use proceeds from the sale of the property to pay administrative expenses or unsecured creditors while disregarding the proscribed priorities of distribution. *Id.* at 379-381. Although *Bird* was decided before *Jevic*, it did rely on Supreme Court authority for its conclusions, noting that in *Law v. Siegel,* 571 U.S. 415 (2014), the Court ruled that exemptions can be denied only on statutory bases enumerated in the Code. *Bird*, at 386.

The case at bar is not a tax lien carveout matter, but the effect of what the Trustee proposes to do is exactly the same: create equity from a property sale based

---

or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."



on a carveout from a junior secured creditor.  The Trustee and that creditor then devise a plan to use that cash value to skip the Debtors' homestead exemption on property which has been withdrawn from the estate and pay administrative expenses and the lower priority class of unsecured creditors.  The *Tillman*, *Christensen,* and *Bird* courts concluded such a plan must fail.  This court may do the same.

### C. The Homestead Exemption Attaches to the Carveout

Debtors recognize there is no controlling precedent on the issue of whether an allowed homestead exemption attaches to funds carved out from the cash value of a secured creditor's claim for the benefit of the estate.[29]  There was a small flurry of cases on the issue ten years ago when a few trustees were offered carveouts by first position secured creditors to do short sales in bankruptcy so that creditor could avoid the California nonjudicial foreclosure sale process.  Those trustees proposed to use the carved out funds to pay administrative expenses and small distributions to unsecured claims while essentially evicting the debtors from their homes without paying anything on their exemptions.  The two bankruptcy cases of note in the Ninth Circuit came to opposite conclusions.  *In re Wilson*, 494 B.R. 502 (Bankr. C.D. Cal. 2013), held that the exemption did attach to the carveout.  *In re Bunn-Rodemann*, 491 B.R. 132 (Bankr. E.D. Cal. 2013) ruled they did not attach.  Since that time, a paucity of cases with split outcomes have also addressed the issue. Debtors submit those which allow the homestead exemption to attach are better reasoned.

In *Wilson*, the debtor asserted a wildcard exemption of about $26,000 in one of two overencumbered properties which she owned when she filed a chapter 7

---

[29] The Trustee at the last minute changed the terminology of his deal with FCS from a carveout to an assignment of a partial interest in FCS's trust deed in hopes of using more a palatable term.  Debtors submit it is a distinction without a difference because the effect is exactly the same:  a portion of the cash value that FCS would be entitled to upon sale of the fully encumbered property will be paid to the estate. Whether an assignment or a carveout, it skips the homestead exemption if used to pay lower priority claims.  In *Jevic* it was an assignment and forbidden.


Shaw & Hanover
Bankruptcy, Creditor Rights & Related Litigation

bankruptcy. The wildcard exemption is provided by Cal Code Civ. Proc. § 703.140(b)(1) and (5), which allow a debtor a limited monetary exemption (modified every three years) in a residence or, if not used for that, any other property; its effect in this setting is identical to the homestead exemption up to the statutory limit of the wildcard. The trustee negotiated a carveout from the first lienholder, which she proposed to use for the benefit of the estate. The debtor objected and said she must be paid her exemption from the sale proceeds before anything went to the estate. The bankruptcy court ruled for the debtor, remarking that "the Trustee is confusing exemptions, on the one hand, with the estate property upon which the exemptions attach, on the other hand." *Wilson*, 494 B.R. at 505. It noted that it was not the carveout which was the asset upon which the debtor held an exemption, but the real property which created the value (upon sale) from which the carveout came. The trustee intended to sell the property under section 363 of the Code. Such sale was subject to all attached interests in the property, whether it be a secured claim or the homestead exemption, and those interests must be paid before the estate would receive anything. *Id*, at 506. It did not matter that the carveout created the available funds, because before those funds could reach the estate all those interests must be paid, including the exemption. Therefore, the exemption attached to the carved out funds.

The District Court for the Eastern District of New York recently reversed a bankruptcy court ruling which failed to apply a homestead exemption to a carveout, called in that case a "give up." *Stark v Pryor (In re Stark),* 2022 WL 2316176 (E.D. N.Y. 2022). Its analysis was similar to that in *Wilson*. In that matter the debtor acknowledged her residence had no equity when she filed a chapter 7. The trustee negotiated a carveout of an unknown sum (subject to the property's value which was unknown) and moved to sell the property with the carveout going to the estate. The debtor objected, not to the sale itself, but to the distribution of the carveout which she asserted was subject to her homestead exemption. The bankruptcy court



allowed the sale on the trustee's terms but the district court disagreed, holding that the exemption attached to the carved out funds.

Analyzing New York exemption law, which is similar to California's on these points, the district court noted that the statute exempted property which was land and a dwelling which the debtor owned and occupied. The trustee's carveout agreement created equity in that property, which was "extracted from 'value' in the property" that was covered by the homestead. Without that property, there would be no value upon sale: "If not [from the property's value], where does it come from?" *Id.* at *5. Furthermore, "[a]t the end of the day, the Trustee is monetizing part of the value of 'a lot of land with a dwelling thereon' that is 'owned and occupied as a principal residence.' And that value is exempted by the New York homestead exemption statute." *Id.* at *6. Just as in *Wilson*, the district court focused on the real property which held the value that became available as equity after the secured creditor's give up. The exemption attached to that property and similarly attached to the carveout.

A bankruptcy court and a district court also defeated a scheme between the IRS and taxing authorities to deny a 65-year-old debtor her homestead exemption in *In re Turnage*, 644 B.R. 656 (Bankr. W.D. N.C. 2022) and *Summerlin v. Turnage (In re Turnage)*, 648 B.R. 793 (W.D. N.C. 2023). Similar to *Christensen* discussed above, the Turnage trustee proposed a deal with the taxing authorities to use section 724(b) to subordinate a portion of a tax lien to pay administrative expenses and then priority creditors, which were the same tax authorities. The subordinated (carved out) funds would not be applied to the homestead exemption because the trustee asserted that the exemption did not apply to tax liens, nor would it apply to estate funds based on those tax liens. Both courts rejected that argument because it altered the statutory priority distribution scheme, stated most succinctly by the district court:

//



> "[T]he Court finds that the carved-out funds are subject to the Debtor's homestead exemption.  The Trustee's argument that because the carved-out funds would otherwise go to the tax liens the homestead exemption is inapplicable is unconvincing.  If the Court adopted the Trustee's position, it would be letting the Trustee and the tax agencies bind the Court and dictate payments to other creditors, this would be improper.  The Trustee and tax agencies cannot defeat the Debtor's homestead exemption by agreement…. once the tax agencies agree to the carve-out they cannot direct the allocation of the value created by such carve-out."

*In re Turnage*, 648 B.R. at 798.

To put it mildly, both these court were outraged by the trustee's plan because it deprived a debtor of her exemption in her residence for the benefit of the trustee, among others.  Debtors here are outraged that their Trustee, in collusion with junior secured creditor FCS, which had demonstrated no inclination to foreclose on their house, brokered a deal which would bypass their homestead exemption to pay lower priority unsecured creditors.

The bankruptcy court in *Christensen* also concluded that the debtors' homestead exemptions attached to the proposed carveouts.  "[I]f the secured creditor caps its claim in an amount that is less than the value of the debtor's interest in the property, the remaining value of the debtor's interest in the property is subject to other claims or interest, if any" which would include the debtors' homestead exemptions before any funds go to the estate.  *Christensen*, 561 B.R. at 207-208.

These cases all present a uniform view.  The asset which generated the cash value which is carved out is the real property to which the debtors' homestead exemption attached.  Without that property, there is no value to anyone.   Therefore, since the exempted property creates the value in question, the exemptions apply to that value before a lower priority claim may be paid.  The reasoning is simple.  It is correct.



-27-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D. Refusing to Compel Abandonment Based on A "Compromise Motion"**

**Which Compromises Nothing Was An Abuse of the Court's Discretion**

11 U.S.C. §554(b) of the bankruptcy code (the "Code") states:

> "(b) On request of a party in interest and after notice and a
> hearing, the court may order the trustee to abandon any
> property of the estate that is burdensome to the estate or that is
> of inconsequential value and benefit to the estate."

The Code does not further go on to say…unless the Trustee and a secured creditor on property of the estate can come up with a manufactured controversy to get around paying a debtor's exemption on the property and circumvent the priority scheme of payments to creditors under the Code through a "compromise" motion, where there is no dispute to compromise, or through a "carve-out" of a secured creditor's lien that will benefit the Trustee with a small dividend to creditors. However, that is exactly what happened in the case at hand.

Pursuant to 554(b), the Debtors filed the Abandonment Motion because the Residence was overencumbered, which is not in dispute. There was no equity in the Residence, even before taking into account the Debtors' homestead exemption and the Tax Liens, as discussed in the facts above. Therefore, the Residence was "of inconsequential value and benefit to the estate" and "burdensome" with its growing mortgages and property tax debts secured against it, making abandonment the only appropriate action to be ordered by the bankruptcy court.

However, the bankruptcy court espoused that even if "some higher court concluded that [the Trustee's deal with FCS was] not a 9019 motion," it could be considered a "105 motion"[30] by which the bankruptcy court could order the same result. That result was that the Debtors' homestead exemption did not have to be paid from a sale of the Residence, even though California law required, it subject to a few inapplicable limitations in section 522 of the Code. However, as will also be

---

[30] EOR 00594 at lines 17-21.



-28-

discussed in further detail below, section 105 does not give the bankruptcy court the authority to order what it did here. The granting of the Compromise Motion was not a lawful way to create nonexempt equity in the Residence and, therefore, the bankruptcy court exceeded its discretion in denying the Debtors' Abandonment Motion and it must be reversed.

**E. A "Compromise Motion" of A Nonexistent Controversy Is Not Proscribed by the Code, Even Under the Bankruptcy Court's 105 Powers**

Under the guise of Rule 9019 , which allows a bankruptcy court to "approve a compromise or settlement" by a trustee with another party, the Trustee sought permission to essentially receive a transfer/"assignment" of a portion of FCS's 3rd deed of trust on the Residence, in exchange for an agreement by the Trustee to seek approval from the bankruptcy court to sell the Debtors' Residence out from under the Debtors (i.e. not pay their homestead exemption), allowing FCS to circumvent normal California foreclosure laws and timing requirements as well as California homestead exemptions.

First, as discussed above, and is clear from the Trustee's analysis in the Compromise Motion, there is no compromise of any controversy between the Trustee and FCS. The Trustee goes through the analysis of the required *A&C* Factors[31] in the 9th Circuit, but quite ethically, to his credit, does not misrepresent that there is some controversy applicable to any of the factors.[32] Under the requirement of analyzing the "Probability of Success in Litigation"[33] the Trustee speaks of no current or prospective litigation that could be brought against the estate by FCS or vice versa; and under "Difficulties in Collection"[34] the Trustee alleges no

---

[31] See *In re A & C Properties,* 784 F.2d 1377, 1380 (9th Cir. 1986) for the "A & C Factors."
[32] EOR 00097 at line 24 through 00099 at line 14.
[33] EOR 00097 at line 24 through 00098.
[34] EOR 00098 at lines 1-4.



debt that would need to be collected from FCS ever. But here is where things get a bit murky, legally. Under the "Complexity of the Issues"[35] involved in related litigation, there is no discussion at all other than the Trustee stating that the "legal issues involved are not overly complex;" however, the Trustee mentions no "legal issues" being litigated or even in controversy. Under the "Best Interests of Creditors"[36] heading, where there would typically be a discussion about whether ceasing litigation and entering into a "settlement" is better for creditors than continuing litigation,[37] there is simply a discussion about how the Trustee signing the Stipulation/agreement with FCS will pay creditors something (assuming the Trustee can sell). Therefore, from a simple review of the Trustee's analysis of the factors applicable to a usual "9019 Motion" there is no compromise at issue.

Thus, without a compromise of controversy that gives rise to a "recovery" under the Code, there is no authority for the Trustee to sell the Debtors' Residence and not pay the Debtors' homestead exemption (as discussed above), through only a voluntary assignment of a portion of the 3rd deed of trust. Analysis of the bankruptcy court's ruling confirms this as well. Nowhere in the bankruptcy court's ruling does it give one reason, legal or factual, why it believes there is a valid compromise of any controversy before it. In fact, the only portion of the bankruptcy court's ruling on the Compromise Motion on this issue was:

> "(counsel for the Debtors) you make a lot about whether this falls under Rule 9019. I think it does. Clearly, the third lien holder's position at the outset is, I want to be paid in full now. That's what every lender's position is. Trustee says, I can't help you. I can't administer the case on that basis. Trustee counters and says, I can administer it under the following circumstances. You got to give up part of your lien. You got to transfer it to the estate."[38]

---

[35] EOR 00098 at lines 5-6.
[36] EOR 00098 at lines 7-14.
[37] See *In re A & C Props,* at 1380.
[38] EOR 00593-00594 [Transcript for March hearing at page 20, line 24-page 21, line 6].



The bankruptcy court reasoning, simply put, shows no controversy. Instead, the bankruptcy court describes what every creditor wants from a bankruptcy- that they be paid. Though the creditor wants to be paid and the bankruptcy court thinks payment to creditors would be a "spectacularly good result for creditors," the court's ruling that "(t)hat's a reason to approve (the Compromise Motion) right there," is not what the Code proscribes.[39] There is no doubt that the Debtors would like to see their creditors paid as well, but not at the expense of their homestead exemption and the displacement of their family of five, which is also not proscribed under the Code.

This is nothing more than a business transaction between the Trustee and FCS. So, does a business transaction give rise to authority under the Code to manufacture a "compromise" motion and obtain an assignment of a portion of FCS's lien under the guise of a "105 motion"? In other words, does section 105 allow the Trustee to call the voluntary assignment of a portion of the 3rd deed of trust a "recovery of a transfer" and then sell the Residence without payment of the Debtors' homestead exemption because this is somehow analogous to a situation under section 522(g)[40] where a debtor is not entitled to claim an exemption on "recovered" property? The bankruptcy court espoused that it did have such authority[41] but the answer must be a resounding "no." The bankruptcy court's reasoning for section 105 authority here is also misplaced. Certainly we do want

---

[39] EOR 00594 [Transcript of March hearing at page 21, line 7-8].

[40] Section 522(g) provides: "(g) Notwithstanding sections 550 and 551 of this title, the debtor may exempt under subsection (b) of this section property that the trustee recovers under section 510(c)(2), 542, 543, 550, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, if— (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and (B) the debtor did not conceal such property; or (2) the debtor could have avoided such transfer under subsection (f)(1)(B) of this section."

[41] EOR 00594 [Transcript for Mach hearing page 21, lines 17-21].



"trustees to come to court and say we want court approval for our agreements…" but it does not follow that under section 105, the court may order that the Trustee can manufacture a controversy and sell the Debtors' Residence free and clear of their homestead exemption, solely because the bankruptcy court has *said* the assignment of a portion of the 3rd deed of trust is just *like* a "recovery" of an interest in property that results from litigation or resolution of some controversy that was brought about to undo improper and voluntary transfers by a debtor before filing the case. That was the reason that section 522(g) was enacted. In other words, in order for the Trustee to sell and not have to pay the Debtors' homestead exemption, like section 522(g) might facilitate, the court would have had to find that the Trustee "recovered" something here, through the Compromise Motion. The Debtors did nothing improper to justify a "recovery" of a portion of the 3rd deed of trust and to justify disallowance of their homestead exemption. The Debtors fell on hard times and ended up with an over encumbered Residence, plain and simple.

The Trustee asserted he was not seeking to sell pursuant to "522(g) or a 510 (c) situation" and that "the agreement (with FCS) is not an equitable subordination agreement…".[42] Instead he argued that the sale was allowed because of "522(c), which provided that an exemption does not apply against a voluntary mortgage or deed of trust."[43] Again, this demonstrates the Debtors' position; there is no argument that the Debtors' homestead exemption comes after consensual liens, but there is no statute that gives rise to powers of sale of the Residence by a lienholder (FCS or the Trustee) other than through a lawful state law prescribed foreclosure.

However, in an effort to support the "spectacular" result the bankruptcy court saw for creditors here, and after acknowledging that section 522(g) was not the statute that would facilitate the Trustee's right to sell the Debtors' Residence,[44]

---

[42] EOR 00589 [Transcript for March at page 16, lines 5-7].
[43] EOR 00589 [Transcript for March at page 16, lines 7-11].
[44] EOR 00597 [Transcript for March hearing at page 24, line 4].



without paying all other junior secured creditors and the Debtors' homestead exemption, as required by the Code (and discussed above in relation to *Jevic*), the bankruptcy court then switched its position and stated it believed "there (was) a compromise of a dispute here."[45] But what is the "dispute" the court refers to here? It is not one at all when you look at actual ruling of the bankruptcy court. The bankruptcy court specifically holds that the alleged "dispute"/controversy is simply the creditor/FCS agreeing to take less on payment of its claim *if* the Trustee can somehow sell the Debtors' Residence and get FCS around the foreclosure laws in California.[46] In exchange for a promise by the Trustee to take action (*i.e.* sell the Residence), the creditor/FCS is agreeing to "subordinate" its claim to other creditors that are *not* next in line to be paid; a right it does not have in accordance with *Jevic*.[47] That is simply not a controversy/dispute to be resolved and "blessed" by a compromise motion under Rule 9019 and such a ruling is an abuse of the court's discretion.

The Trustee was not arguing in his papers or at the first hearing on the Motions that he was seeking to "recover" a portion of FCS's lien and sell pursuant to 522(g) or analogizing this case to same.[48] There was no controversy about FCS's lien, the bankruptcy court confirmed this, as well, when it held that "(a)ll parties agree that the third deed of trust is **valid** (*emphasis added*)."[49] Therefore, FCS's lien would not have given rise to a complaint/controversy of any type, that would lead to a "recovery" of something.

However, after the initial briefing and the first hearing on the Motions, the Trustee likely realized that he needed a legal connection to facilitate the sale under the Code even if the assignment contained in the Compromise Motion was

---

[45] EOR 00594 [Transcript for March hearing at page 21, lines 13-14].
[46] EOR 00594 [Transcript for March hearing at page 21, lines 1-6].
[47] *Id.*
[48] EOR 00589 [Transcript for March hearing at page 16, lines 5-8].
[49] EOR 00597 [Transcript for March hearing at page 26, line 19-20].



approved. This revelation likely came from the bankruptcy court's comments

regarding the "avoiding" or "recovering in part a lien on property" when it ruled as

follows:

> "…there's absolutely nothing unusual with the Trustee
> avoiding in part or recovering in part a lien on property.
> That happens all the time. Well, Debtors do it on the other
> side. Debtors regularly file 522(f) motions to avoid liens,
> and they keep the property. Trustees on the other side
> regularly file complaints under 547 or 548 or 544 to avoid
> liens on property that the Trustee will eventually sell. It's
> very common. There's nothing unusual whatsoever in a
> trustee attacking a lien or getting assignment of the lien and
> then selling the property subject to lien. That's ordinary
> course of business."[50]

However, the bankruptcy court then goes on to prove the point that Debtors

were trying to make when it holds that "522(g)…isn't relevant here."[51]

After the first hearing on the Motions, the Trustee went back to the drawing

table to try and fill the gap between obtaining a piece of a lien against the Residence

through a contrived compromise and getting to a sale authorized under the Code

through said "compromise." Fortunately for all debtors who end up in troubled

times in bankruptcy with overencumbered homes that they will need to address after

their bankruptcy to stay in their family home, the Trustee came up with no solution,

other than to argue that which the bankruptcy court already stated was not

applicable to the case at issue. In enters *In re Roach*.[52]

In the Trustee's supplemental brief in support of the Compromise Motion, the

Trustee asserts that his receipt of the *voluntary* assignment of FCS's lien is "similar"

to the assignment the trustee in *Roach* received. However, there is no law to support

this and there were two major differences of which the Trustee concedes to both (i.e.

---

[50] EOR 00596-00597 [Transcript of March hearing at page 23, line 18 through page 24, line 3].

[51] EOR 00597 [Transcript of March hearing at page 24, line 4].

[52] *Roach v. Marshack (In re Roach)* (B.A.P. 9th Cir. 2019) (*Unpublished*).



no litigation, especially relating to a 522(g) transfer/something the Debtors did; and no 510 subordination agreement obtained).[53]

First, in *Roach*, the Trustee was involved in **<u>litigation</u>** with the lender to which the debtor had given a voluntary lien on the debtor's residence.[54] The *Roach* trustee ultimately settled the litigation, by filing a motion to approve a compromise (like the Trustee did here) of real litigation with the lender (which is not present here).[55] This is the first key to avoiding the effect of the Debtors' homestead exemption on the sale proceeds from their Residence, under 522(g), and an important difference from the case at hand, where there is admittedly no litigation to be compromised and no "recovery" to be obtained by the Trustee.

Second, the trustee in *Roach* received the assignment from the junior lienholder through a "subordination agreement pursuant to Section 510 of the…Code" as part of the settlement.[56] This type of agreement is not present here. As discussed above, the bankruptcy court has found 522(g) does not apply here,[57] and the Trustee has conceded that as well.[58] This subordination agreement coupled with approval of same through a compromise of a real dispute between the Trustee and the lender gave rise to the result in *Roach* (an unpublished opinion where the debtor did not oppose the compromise) where the debtor's homestead exemption did not attach to the proceeds the lender carved out, all pursuant to section 522(g).

Neither of these two key facts exist that would give rise to a sale pursuant to section 522(g) and/or a disallowance of the Debtors' homestead exemption on sale proceeds from the Residence. Section 522(g) was enacted to preclude debtors from claiming an exemption in property for which they had made voluntary, but possibly

---

[53] EOR 00514, lines 10-13.
[54] EOR 00513, lines 1-3.
[55] EOR 00513, lines 3-6.
[56] *Id.*
[57] See Footnote 51 above.
[58] See Footnotes 42 & 43 above.



avoidable, transfers of property interests before filing and which a bankruptcy trustee had worked to set aside/recover for the estate. Wrong-doing is not alleged anywhere in the Compromise Motion, therefore, why would the Code allow the bankruptcy court to sell the Debtors' Residence and not pay their homestead exemption from the sale proceeds? The bankruptcy court's answer to his question is its powers under section 105.  However, as discussed below, that is an abuse of the court's discretion and a misuse of those powers.

FCS agreed to assign the bankruptcy estate a portion of its deed of trust in hopes of avoiding the foreclosure laws in California. Is the Trustee now doing business as/standing in the shoes of a lender, even if the Compromise Motion is approved in accordance with Rule 9019 or section 105 of the Code? Yes. What can any lender do with a deed of trust that is in default? They can foreclose. Therefore, Debtors submit that even if it is lawful for the Trustee to receive "an assignment" of a portion of the 3rd deed of trust, as some type of business "deal," there is nothing that then allows the Trustee, as a holder of a piece of that deed of trust, to simply sell the Residence and not pay the Debtors' homestead exemption.  The bankruptcy court's "105 powers" cannot afford the Trustee this right either. In fact, the Trustee really only asserted authority he didn't have, to take an action the Code does not allow- sell an overencumbered asset that should have been abandoned from the estate.

Therefore, if there is no controversy to compromise, there is nothing for the Trustee to "recover."  The Trustee's reliance on *Roach* to avoid paying the Debtors' homestead exemption, and sell pursuant to the subordination rights that the trustee in *Roach* sold under, is wholly misplaced.  The law, even section 105, dictates that the portion of the Compromise Motion, which purports to convert a simple business deal between the Trustee and FCS into a resolution of a controversy which results in a "recovery" of a nonexempt asset, should be denied.

//



**F. Bankruptcy Code Section 105, Longstanding Policies and Equity Weigh Against a Trustee Selling Fully Encumbered Property and Evicting Debtors**

Debtors were aware when they filed their chapter 7 petition that their home was underwater when the tax liens were taken into account. They also were advised that – because trustees are generally prohibited from selling fully encumbered property - they could expect to discharge their dischargeable debts and receive a fresh start from the bankruptcy, which would then allow them to address the secured debts while maintaining their residence. The Trustee and FCS have orchestrated a plan which would destroy those dreams and have the dire consequence of evicting a family of five from their home. The bankruptcy court blessed this collusion and actually applauded the Trustee's ingenuity. But the bankruptcy court overlooked the fresh start purpose of bankruptcy and the downside to all debtors if such schemes are countenanced.

Section 105(a) of the Bankruptcy Code gives the bankruptcy courts the power to issue any order that is necessary or appropriate to carry out the provisions of this title. One of the provisions of "this title" (the Bankruptcy Code) is to distribute estate assets in the order of priority set forth in section 507. Another is to honor the exemptions allowed under section 522. Either of those Code sections gave the bankruptcy court here the power to deny the Trustee's "Compromise" and abolish the order of distribution orchestrated by the Trustee and FCS. After all, several courts have noted that to allow trustees and creditors to dictate how estate funds are allocated "would be improper." The *Turnage* court used that polite term but others have been more stridently opposed, as discussed above. And no wonder, because this outcome is an abomination, to be struck down, not admired.

Several of the cited cases explained why a trustee normally is prohibited from selling a fully encumbered asset, as established by the United States Trustee's Chapter 7 Handbook and ample case law, including a much-cited case from the



Ninth Circuit BAP, *In re KVN,* 514 B.R. 1 (9th Cir. BAP 2014).  *KVN* dealt with a trustee who had made a deal with a creditor for a carveout for the estate if the estate auctioned personal property worth far less than its secured claim.  The bankruptcy court denied the stipulation, perceiving that only the trustee would benefit, despite a promise to use some funds to pay unsecured creditors.  This was a corporate bankruptcy with no exemptions in play and no junior liens.

On appeal, the BAP reversed the outright denial and remanded for a factual determination on whether there was a substantial benefit to the estate.  However, in doing so, it discussed at length why "The General Rule [is] That the Sale of Fully Encumbered Property is Prohibited," a caption in the opinion.  *Id.,* at 5. It cites to a myriad of caselaw, mostly from bankruptcy courts, all of which acknowledge "universal recognition" that such sale is prohibited.  The BAP also references the Handbook for Chapter 7 Trustees promulgated by the Office of the United States Trustee:  "Generally, a trustee should not sell property subject to a security interest unless the sale generates funds for the benefit of unsecured creditors." *Id.* Summed up, the BAP concluded that such sales were generally improper and that the proper action is to abandon the property. *Id.* at 6.

The *Christensen* and *Bird* decisions also impress the principle that it is not within a trustee's normal fiduciary duties to make deals so that he can sell fully encumbered property.  The proper disposition is abandonment. *Bird*, 577 B.R. at 377-379; *Christensen*, 561 B.R. at 205.

Despite these admonitions, the Trustee here, with the bankruptcy court's blessing, defied the general rule and went out of his way to create a scenario which would dispossess the Debtors of their home without any homestead exemption funds to foster a fresh start.  Debtors have cited numerous legal reasons why this is wrong.  But what about equity?  Should trustees be encouraged to evict debtors from their homes by colluding with creditors to create "equity" which the estate can grab, ignoring homestead exemptions and leaving debtors homeless and penniless?



-38-

1  What ever happened to that ubiquitous fresh start for the honest but unfortunate

2  debtors?

3      The underlying bankruptcy court's decision encourages trustees to go out of

4  their way to try to sell homes which should be abandoned.  Although not

5  "precedential" it sets a precedent which should make every debtor's counsel

6  shudder.  How can they advise their clients to use their ample homestead

7  exemptions to protect the equity in their homes when there are trustees out there

8  who will labor to create a scenario that sells the home while ignoring the homestead

9  exemption? If the Trustee here is allowed to make a deal with a junior secured

10  creditor that allows sale of the house without honoring the homestead exemption,

11  then can't every trustee do the same with every property?  Many junior creditors,

12  even when "in the money," might jump at the chance to be paid a discounted sum

13  on their junior debt and be done with it.  Where would it stop?

14      Debtors suggest it stops here with reversal.

15  **VII.    CONCLUSION**

16      For the reasons stated above, Debtors request this court to reverse the

17  decisions of the bankruptcy court so that they might save their family home.

18  Dated: July 14, 2023                    Respectfully submitted,

19                                          SHAW & HANOVER, P.C.

20                                          */s/ Summer Shaw*

21                                          _____

22                                          Summer Shaw/Meredith A Jury (Of
                                            Counsel), Attorneys for Appellants,

23                                          Marcos & Natalie Romero

24

25

26

27

28


Shaw & Hanover

1

## **DISCLOSURE STATEMENT REQUIRED BY FED. R. BANKR. P. 8012**

2

(a) There are no nongovernmental corporations that are parties to this

3

proceeding.

4

(b) (1) Each debtor is named in the caption. There are no other debtors who

5

are not named in the caption.

6

(2) There are no debtor corporations that are parties to this appeal.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1

2

## **Certificate of Compliance**

3      The undersigned certifies that the Opening Brief by Appellants, dated July 14,

4  2023, complies with the type-volume limitations of Federal Rule of Bankruptcy

5  Procedure 8015(a)(7) because the text of brief contains 10,526 words (excluding the

6  parts exempted by the rules) according to Microsoft Word, the word-processing

7  program on which the brief was prepared.

8  Dated: July 14, 2023                            _____*/s/ Summer Shaw*_____

9                                                               Summer Shaw

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Certificate of Corporate Disclosure and Statement of Interested Parties**

The undersigned certifies that the following parties have an interest in the outcome of this appeal and/or have at least a ten percent (10%) interest in an entity in a party to this appeal.  Appellants makes these representations to enable the judge on appeal to evaluate possible disqualification or recusal.

- Todd A Frealy, Chapter 7 Trustee and Appellee
- Marcus & Brenda Romero, Debtor and Appellant

Dated: July 14, 2023                    _/s/ Summer Shaw_
                                        Summer Shaw



-42-

1

## <u>Certificate of Related Appeals</u>

2    The undersigned certifies that the following are known appeals that are

3    related to this appeal: **None.**

4    Dated: July 14, 2023                                  */s/ Summer Shaw*

5                                                           Summer Shaw

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


Shaw & Hanover

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **44-901 Village Court, Suite B, Palm Desert, CA 92260**

A true and correct copy of the foregoing document entitled (*specify* **APPELLANTS' OPENING BRIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by L.R. 5-4 in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and L.R 5-3.3, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 14, 2023**, I checked the CM/ECF docket for this case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

   • Summer M Shaw ss@shaw.law

   ☐  Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL:**
   On (*date*) **07/14/2023** , I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

   > **APPELLEE (*Brief only*)**
   > **Todd A. Frealy**
   > **3403 Tenth Street Suite 709**
   > **Riverside, CA 92501**

   ☐  Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 (d)(3) and/or controlling L.R. 5-4, on **07/14/2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

   **APPELLEE:** *Emailed Brief & Appendix & EOR to:* taf@lnbyb.coom   (with Appellee's authorization)

   ☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 07/14/2023 | Teresa Stone | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                          **F 9013-3.1.PROOF.SERVICE**

